[Civ. No. 8892. Second Appellate District, Division Two.—May 23, 1933.]

OCEAN ACCIDENT & GUARANTEE CORPORATION, LIMITED (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION, GRACE L. BIGGAR et al., Respondents.

Redman, Alexander & Bacon and R. P. Wisecarver for Petitioner.

A. I. Townsend for Respondent Industrial Accident Commission.

Benjamin P. Oakford for Respondent Biggar.

WORKS, P. J.—Original application for the writ of review.

Respondent Grace L. Biggar, the relict of William B. Biggar, who was killed in an automobile accident, was allowed an adjustment of industrial compensation for her husband's death. The award ran against T. G. Murphy, who was doing business as the Sun Roof and Paint Company at Santa Monica. The place of business of respondent Paraffine Companies was in Los Angeles. Petitioner, the insurance carrier of Murphy, asks that the award be wholly annulled, or in default of that outcome that it be annulled with directions to the Industrial Accident Commission to adjust compensation to the widow in a less amount than that already awarded her, and under a process other than that employed by the commission in making the award. In disposing of the points arising in the proceeding we shall naturally recite only those portions of the evidence which show a substantial support for the findings of the commission.

Petitioner contends that either respondent Paraffine Companies, hereafter to be called Paraffine, was the em-

ployer of Biggar, or that he was in the joint employ of that concern and Murphy. We think Murphy was the sole employer. In truth, we fail to perceive how the commission could have found otherwise. Paraffine was either the manufacturer or the general distributor of certain roof material and paints. The products were by the company furnished to wholly independent concerns, which carried the stuff as part of their stock in trade. Murphy's was one of these independent places. It was the custom of Paraffine, because of its interest in the disposition broadcast of its products, to procure and aid in the training of salesmen and to send them to dealers in the products who needed salesmen. Paraffine often advertised in the newspapers for such men, and Biggar responded to one of these advertisements. He was placed under the tutelage of one Pierce, an employee of Paraffine and apparently an able instructor of student salesmen. Pierce often continued his instruction of these men, or at least aided them in their work, after they had been offered to sellers of the products of Paraffine, and had been accepted by such sellers. Murphy's place at Santa Monica was in charge of a man named England, although Murphy had another place of business, managed by himself, in Los Angeles. The Santa Monica place was a "branch" of the Los Angeles one. England, at the time of the hearing before the commission, had disappeared, and his testimony was for that reason never obtained. Murphy himself testified, however, that Biggar had been sent to the Santa Monica place by Paraffine, as a salesman, and that England had accepted him and put him to work. Murphy, because of his absences from the Santa Monica house, had never seen Biggar, but he testified distinctly that Biggar was in his employ at the time of his death. There was other evidence to support this admission, particularly in the testimony of Pierce, but more is not necessary. Paraffine, the commission could hardly have avoided finding, was never the employer of Biggar, either sole or joint.

Biggar was under employment by Murphy but four or five days before his death. Pierce aided him in his work, principally watching him while he performed it, and coached and in a sense instructed him—Pierce testified that Biggar was above the average of salesmen in intelligence and ability—until the day of his death. Pierce was told

by one Davis, an officer of Paraffine, to report to Murphy when he went to Santa Monica to aid Biggar. On the day of Biggar's death England, at Murphy's place of business in Santa Monica, and in the presence of both Pierce and Biggar, made an engagement for the two latter to meet at a certain place in Sawtelle, in the Santa Monica district, at 6 o'clock that evening. The place was at a certain street corner. The meeting was arranged so that Biggar and Pierce might go together from the corner to see certain "prospects" of Biggar's who were likely to be at home at that time. Pierce arrived at the street intersection five or ten minutes late, but Biggar was not there. Pierce noticed a crowd congregated about fifty feet from the corner, went to the spot, found there had been an automobile accident and that Biggar had been injured in it. He died at a hospital two hours later. It is contended that Biggar, at the time of the accident, was within the so-called "going and coming" rule. We think all the evidence shows the contrary. It is true that Biggar went from home—for he had an early dinner there in order to keep his appointment with Pierce—but he did not travel toward his employer's place of business, but toward a location designated by England and which was convenient to the place where Biggar and Pierce expected to interview the prospects, and he therefore traveled on a special mission for his employer.

 It is also insisted that Biggar was an independent contractor, and the brief of petitioner contains this statement: "There was a failure to show one single thing in which Murphy had any direction and control over Biggar." This observation is nullified by the statement already made, to the effect that England arranged for Biggar to meet Pierce at the street intersection on the evening of Biggar's death. Murphy testified that on that day England "instructed" Biggar "to go out during the day and get prospects and then meet Pierce at the time and place designated". Further, it was the duty of Biggar to report at the Santa Monica office at 9 o'clock each morning. It is true that thereafter, during the day, it was customary for him to search for prospects in his own way, and that he drove and furnished the upkeep of his own car. His compensation was to be a certain commission on sales made by

him. The employment called for service on six days of the week. Murphy testified that the purpose of the morning report at the office was to "get started for the day's work, get out in the territory". He instructed England that "each man should be thoroughly trained before he is put out on his own". Murphy also testified that England handled the selling for the Santa Monica office and that he had men "working under him in the territory" in the month of Biggar's death for that purpose, but corrected the statement in response to a clearing-up question by saying that Biggar was the only man "working for him or under him" during that month. He also said that England "took charge of the men under him" during the time when Biggar was with the office, but when he was asked what he meant by "took charge of the men" he responded, "I mean Mr. Biggar." He had gotten this information from Pierce and from Davis, the latter being the officer of Paraffine who had sent Pierce to Santa Monica. The following occurs in the testimony of Pierce: "Q. Who fixed the time that you were to meet him [Biggar] on Monday, Tuesday and Wednesday mornings [days during which Pierce was aiding or instructing Biggar]? A. Mr. England. Q. Who fixed the time that you would report there? A. Mr. England." Murphy testified: "Q. Did the men in the Santa Monica district work under you or under Mr. England? A. They worked under Mr. England." The records of the Santa Monica office disappeared with England, but certain material papers were found on the body of Biggar at the time of his death. These were three in number and were printed on cardboard. Each was headed "Salesman's Report Shingle Prospect". They were ruled and at the left ends of various printed lines it was indicated in appropriate words in type that certain information was to be placed on the respective lines. This information included the name, address and telephone number of the prospect and the location of the job he contemplated. There was also a place for a date, and several lines were left under the word "Remarks". On the bottom line was printed "Salesman", and after this word on each card was signed Biggar's name in his handwriting. Each of the cards was filled out, also, in his handwriting. We think the evidence showed that Biggar was an employee and not an indepen-

dent contractor. The last item of evidence was significant. It would be unreasonable to suppose that Biggar was making out reports to himself. The reports, on the other hand, must be supposed to have been made for an employer, and the very making of them indicated a control of the employer over Biggar, that factor being the principal one, under all the authorities, which distinguishes an employee from an independent contractor.

We are satisfied that Biggar's widow was entitled to an adjustment of compensation against Murphy, but the remaining question in the proceeding is whether the Industrial Accident Commission adopted the proper mode in fixing the compensation it awarded her. The means to be followed in providing compensation are prescribed by section 12 (a) of the Workmen's Compensation Act (Deering's Gen. Laws, 1931, Act 4749), which, after a preliminary statement of some length, contains four subdivisions. Each of these latter fits a case which is different from that covered by any of the others.

The four subdivisions of the section read thus:

"(1) If the injured employee has worked in the same employment, whether for the same employer or not, during at least two hundred sixty days of the year preceding his injury, his average weekly earnings shall consist of ninety-five per cent of six times the daily earnings at the time of such injury where the employment is for six full working days a week. Where his employment is for five, five and one-half, six, six and one-half or seven working days a week, the average weekly earnings shall be ninety-five per cent of five, five and one-half, six, six and one-half or seven times the daily earnings at the time of the injury, as the case may be.

"(2) If the injured employee has not so worked in such employment during at least two hundred sixty days of such preceding year, his average weekly earnings shall be based upon the daily earnings, wage or salary of an employee of the same class working at least two hundred sixty days of such preceding year in the same or a similar kind of employment in the same or a neighboring place, computed in accordance with the provisions of the preceding subdivision.

"(3) If the earnings be irregular or specified to be by the week, month, or other period, then the average weekly earnings mentioned in subdivisions (1) and (2) above shall be ninety-five per cent of the average earnings during such period of time, not exceeding one year, as may conveniently be taken to determine an average weekly rate of pay.

"(4) Where the employment is for less than five days per week or is seasonal, or where for any reason the foregoing methods of arriving at the average weekly earnings of the injured employee cannot reasonably and fairly be applied, such average weekly earnings shall be taken at ninety-five per cent of such sum as shall reasonably represent the average weekly earning capacity of the injured employee at the time of his injury, due consideration being given to his actual earnings from all sources and employments during the year preceding his injury; provided, that the earnings from other occupations shall not be allowed in excess of the rate of wages paid at the time of the injury."

The difficulties presented to us are indicated by these warring contentions: Petitioner contends that the award should have been made pursuant to subdivision (4), but asserts that the commission proceeded under subdivision (2). The commission itself insists that the award was proper under the latter named subdivision. Respondent Grace L. Biggar says that the award was made under subdivision (3).

It seems plain that the award is not sustainable under subdivision (2). Under subdivision (1), where the employee has worked at least 260 days of the year preceding a casualty to him, "his average weekly earnings shall consist of ninety-five per cent of six times the daily earnings at the time" of the accident. As the weekly earnings are to be computed from the "daily earnings", we think the clause quoted must contemplate a daily wage or stipend fixed by the employer as the compensation for the employee, something stable in character. With the clause in that form we cannot perceive that the legislature intended to refer to an average daily wage, to be computed from the erratic earnings, for instance, of a salesman working for a percentage of the amount of his sales. We think the phrase "daily earnings", where it is employed the second time in subdivision (1), must receive the same construction. Surely the legislature, in using the same expression twice,

in such close juxtaposition, must have intended the same meaning in each. Where the phrase "daily earnings" is used in subdivision (2) it must have the same meaning for the same reasons. It is to be observed here, in passing, and as affecting the whole subject, that the kinds of employees covered by subdivisions (1) and (2) are the same. The basic difference in the two is that one refers to employees who have themselves worked at a job "at least two hundred sixty days of the year", etc., and the other to employees who have not worked so long. Upon this basic difference the method to be employed under one subdivision is different from that to be applied under the other; but, logically and ethically, the compensation awarded to a man under one should be the same as that awarded to one under the other, all other things being equal.

We think it patent that subdivision (4) cannot be invoked to uphold the award. It applies only to those cases in which "the employment is for less than five days per week". The only evidence to which we are pointed on this question—and we think it is the only evidence adduced upon the subject—was to the effect that Biggar's employment was for six days the week. Because of the potent influence of this point we have not thoroughly considered others affecting the applicability of subdivision (4).

This leaves remaining only subdivision (3), and we think the award may be upheld under it. Before we go to that point let us first refer to a clause in (3) that aids in the construction we have already placed upon the expression "daily earnings", as it occurs in (1) and (2). Subdivision (3) begins: "If the earnings be irregular, or specified to be by the week, month, or other period . . . " This language is by the form and arrangement of the statute placed in opposition to the phrase "daily earnings", found in (1) and (2). Under (3) the earnings may be "irregular". Therefore, the "daily earnings", referred to in (1) and (2) must be regular while the weekly average must be ascertained from regular daily earnings. Under (3) the earnings may be "specified", or fixed and determinate, for periods of time other than the day. Therefore, the legislature must have intended that the "daily earnings" also should be specified, fixed and determinate, and not average.

From all that has been said, and upon the face of the

subdivision itself, (3) must be applicable in the present instance. Biggar's earnings were to have been "irregular", and no subdivision of section 12 (a) fits such a case except (3) alone.

Without discussing the evidence we think it abundantly upholds the award of the commission under subdivision (3). Indeed, our failure to analyze the evidence arises from the fact that it is so complete and satisfactory. We merely point out that (3) adopts the methods provided for by (1) and (2) as means to ascertain weekly earnings, and provides, especially, that the weekly earnings to be fixed shall be a percentage "of the average earnings during such period of time, not exceeding one year, as may be taken", etc.

Award affirmed.

Stephens, J., and Archbald, J., *pro tem.*, concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 20, 1933, and an application by petitioner to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 21, 1933.